J-A10039-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL THOMPSON | : | |
| | : | |
| Appellant | : | No. 3016 EDA 2024 |

Appeal from the Judgment of Sentence Entered June 14, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003719-2022

BEFORE: STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JULY 20, 2026**

Appellant, Michael Thompson, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury found him guilty of first-degree murder,[1] carrying a firearm without a license,[2] carrying a firearm in Philadelphia,[3] and possession of an instrument of crime.[4] Sentenced to life imprisonment on the charge of first-degree murder, Appellant challenges the sufficiency of the evidence, weight of the evidence, and the trial court's evidentiary rulings. After careful consideration, we affirm.

The trial court's Pa.R.A.P. 1925(a) opinion sets forth the pertinent facts and procedural history, as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. 2502.
[2] 18 Pa.C.S.A. 6106.
[3] 18 Pa.C.S.A. 6108.
[4] 18 Pa.C.S.A. 907.

On September 20, 2020, Appellant was inside the home of his girlfriend at 3859 North Smedley Street in Philadelphia.[Fn1] Decedent Robert Lee, Jr., who lived across the street, was outside washing his white Buick. Appellant, wearing a black hooded sweatshirt with the hood up, exited the back door of the home into an alley, then around the corner onto Smedley Street and ran up to Mr. Lee. Just as he reached Mr. Lee, Appellant pulled a gun from his pocket, which action also dislodged Appellant's mobile phone, causing it to fall to the ground where it was later found near Mr. Lee's car. [N.T., 6/11/24, at 38, 51, 100, 113, 177, 217]

---

Fn. 1: A subsequent search of the home revealed the presence of [Thompson's] fingerprints and mail addressed to him.

---

Appellant fired at least six shots, striking Mr. Lee in his right hand, twice in his left side, and then delivered the *coup de grace* with two shots to Mr. Lee's temple at close range. At least one shot also blew out the rear window of Mr. Lee's car. Appellant then retraced his steps, running back down Sedgley Street, turning right on Pike Street, then right back into the same alley running behind his girlfriend's home, and continuing down the alley running past the home, toward West Butler Street at the far end of the block. [N.T., 6/13/24, at 10-11, 21.]

Most of these events are captured by various video cameras in the area. Although the hood remained up, obscuring Appellant's face, the person in the videos has the same build and height as Appellant and the hair style he wore at the time (as shown in the photos extracted from the phone). [N.T., 6/12/24, 137-8]

Police quickly responded to the scene [and took] Mr. Lee . . . to Temple Hospital, where he was pronounced dead. Other police secured the scene, which was then searched by Philadelphia crime scene officers.

The phone, which was first thought to be Mr. Lee's, was recovered and eventually identified as Appellant['s], evidenced by the presence of Appellant's DNA, as well as [by] his personal information when its contents were extracted. Mr. Lee's DNA was

- 2 -

not found on the phone. A warrant was issued for Appellant a week later.

Appellant knew the police were looking for him. However, he [evaded police and] was not arrested until [15 months] later, at which point he had changed his hair style. [N.T., 6/13/24, at 29-31; N.T., 6/14/24, at 13].

Appellant took the stand and testified that he had not been at his girlfriend's home for some time prior to the shooting and that except for some occasional casual sex, he had not been in a relationship with her for six months. However, messages on his phone referred to his being at the home just days before the shooting and to professing his love to his girlfriend. [N.T., 6/13/24, at 96-137].

Additionally, the messages referenced Appellant, just three days before the shooting, discussing the decedent (referred to as "Waters") with his girlfriend, whether the decedent had disrespected her, and Appellant asking her if he should move his stuff out. At trial, Appellant testified that he had been in the vicinity, had planned to visit his cousin who lives nearby, had bought food which he ate in his car, and that he had heard the shots. [N.T., 6/13/24, at 96-137].

. . .

On June 10, 2024, [Thompson] proceeded to trial . . ., sitting with a jury. On June 14, 2024, the jury returned verdicts of guilty [as referenced *supra*]. [On the same day], Appellant was sentenced to life imprisonment on the Murder conviction, and consecutive sentences of 3 ½ - 7 years' incarceration on the Firearms Not to be Carried without a License conviction, 2 ½ - 5 years' incarceration on the Carrying Firearms in Public in Philadelphia conviction, and 2 ½ - 5 years' incarceration on the Possession of an Instrument of Crime [conviction].

Timely post-sentence motions were filed on June 21, 2024, and denied on October 21, 2024.

A timely notice of appeal was filed.

On November 18, 2024, the [trial court] entered orders directing the filing of a Statement of Matters Complained of on Appeal,

pursuant to Pa.R.A.P. 1925(b). An extension was granted and the Rule 1925(b) statement was filed on December 20, 2024.

Trial Court Opinion, 6/26/25, at 2-3, and 1.

Mr. Thompson raises in his counseled Brief of Appellant the following preserved issues for this Court's consideration:

1.  Were the convictions of Michael Thompson for murder of the first degree (18 Pa.C.S.A. § 2502), carrying a firearm without a license (18 Pa.C.S.A. § 6106), carrying a firearm in the Philadelphia streets (18 Pa.C.S.A. § 6108), and possessing an instrument of crime (18 Pa.C.S.A. § 907), against the weight of the evidence?

2. Were the verdicts . . . not supported by sufficient evidence . . . .?

3. Did [the trial court] err in allowing the Commonwealth rebuttal to present several text messages around September 10th through September 20th of 2020 (the murder occurred on September 20, 2020) allegedly between Mr. Thompson and his former girlfriend, Susanne Arnold . . . since these texts contained material information in the messages which were not properly authenticated, and this denied Mr. Thompson the right to confront a witness since Ms. Arnold was never called by the Commonwealth to testify?

4. Did [the trial court] further err, and did the District Attorney also err, during the trial, since [the trial court] initially only allowed the aforementioned text messages of Ms. Arnold for impeachment only, not as substantive evidence and the District Attorney then ignored the ruling of [the trial court] by using these improperly unauthenticated text messages, where there was no right of confrontation, as substantive evidence in his arguments to the jury when he argued that these text messages provided substantive evidence that showed the motive of Mr. Thompson to kill, and the reason for Mr. Thompson to kill, and which showed that Mr. Thompson had a gun?

5. Further, did [the trial court] err in [its] charge to the jury when [it] instructed the jury on the above rebuttal text messages, and in his charge, told the jury the text messages could be treated as substantive evidence, in contradiction to his trial order that these could only be used for impeachment purposes? Further, did the [trial court] err in allowing the texts as substantive evidence when there was no right to confront Ms. Arnold and the texts were not properly authenticated?

Brief of Appellant, at pp. 7-11.

In Mr. Thompson's first two issues, he challenges the sufficiency of the evidence and the weight of the evidence, arguing that the Commonwealth did not meet its burden of proof with what he describes as the unreliable, conjectural, and self-contradictory evidence it offered at trial. He maintains that when all evidence bearing on the identity of the shooter is reviewed, one must conclude that the verdict was based on assumptions and speculations, which renders his conviction shocking.

Our standard of review when presented with a claim challenging the sufficiency of the evidence is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element

of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing on the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

***Commonwealth v. Bragg***, 133 A.3d 328, 330-31 (Pa. Super. 2016) (citation omitted). Because a sufficiency of the evidence challenge raises a question of law, our standard of review is *de novo*, and our scope of review is plenary. ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 300 (Pa. Super. 2019).

As noted by our Supreme Court:

We have, however, made exception to the general rule that the [factfinder] is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture.

Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution.

This concept, however, must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding.

***Commonwealth v. Karkaria***, 625 A.2d 1167, 1170 (Pa. 1993) (citations omitted and formatting altered).

With respect to identification evidence, this Court has explained:

Evidence of identification need not be positive and certain to sustain a

- 6 -

conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

We note that a challenge to the weight of the evidence is distinct from a challenge to the sufficiency of the evidence in that the former concedes that the Commonwealth has produced sufficient evidence of each element of the crime, but questions which evidence is to be believed.

*Commonwealth v. M. Edwards*, 229 A.3d 298, 306 (Pa. Super. 2020) (citations omitted and formatting altered), *aff'd on other grounds*, 256 A.3d 1130 (Pa. 2021).

*Commonwealth v. Bailey*, (non-precedential decision) 301 A.3d 886 (Pa. Super. filed June 7, 2023).[5]

To sustain a first-degree murder conviction, "the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific

---

[5] Pursuant to the Pennsylvania Rules of Appellate Procedure, we may cite nonprecedential memorandum decisions of this Court that were filed after May 1, 2019, for their "persuasive value." Pa.R.A.P. 126(b)(1)-(2).

intent to kill." ***Commonwealth v. Hitcho***, 123 A.3d 731, 746 (Pa. 2015); 18 Pa.C.S. § 2502(a). "Section 2502 of the Crimes Code defines murder of the first degree as an 'intentional killing,'" which, in turn, is defined as a "willful, deliberate and premeditated killing." ***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013) (citing 18 Pa.C.S. § 2502(a), (d) ). A jury may infer the intent to kill based upon the defendant's use of a deadly weapon on "a vital part of the victim's body." ***Commonwealth v. Sanchez***, 82 A.3d 943, 967 (Pa. 2013) (citation omitted).

> Finally, "[i]n addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." [***Commonwealth v.***] ***Smyser***, 195 A.3d [912,] 915 [Pa. Super. 2018] (citation omitted). It is well-settled that "[e]vidence of identi[ty] need not be positive and certain to sustain a conviction." ***Commonwealth v. Orr***, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*) (citation omitted).
>
> [E]ven if the Commonwealth presented only circumstantial evidence and offered no positive identification of the [perpetrator], we may not weigh the evidence and substitute our judgment for the fact-finder as long as the evidence was sufficient to prove [the accused's] guilt.
>
> ***Commonwealth v. Robertson***, 874 A.2d 1200, 1206 (Pa. Super. 2005); ***see also Commonwealth v. Strafford***, 194 A.3d 168, 175-76 (Pa. Super. 2018) ("[A]ny indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." (citation omitted)).

***Commonwealth v. Torsunov***, (non-precedential decision) 345 A.3d 339, 347–48 (Pa. Super. 2025).

Thompson denies that evidence showed he either possessed or owned a gun at the relevant time or that he committed the shooting. He points to his testimony that Mr. Lee was his good friend and that he had no motive to kill Lee, N.T., 6/13/24, at 33-34, 47-48, and he claims the Commonwealth failed to present any such motive. The video does not identify him as the shooter, he continues, nor is there any evidence that places him at his girlfriend's house at the time the shooter is depicted leaving the house and walking towards Mr. Lee to commit the shooting. Brief of Appellant at 55.

The Commonwealth responds that the evidence was sufficient to prove Mr. Thompson shot and killed Mr. Lee and that the trial court did not abuse its discretion in denying his post-trial motion challenging the weight of the evidence. Addressing first the sufficiency of the evidence claim, the Commonwealth contends that while Mr. Thompson could not be identified definitively from the video alone, the jury was shown "ample" circumstantial evidence—including the video—that, collectively, identified him as the shooter and proved his guilt beyond a reasonable doubt:

> The shooter is seen leaving 3859 North Smedley Street. That address is the home of [Thompson's] girlfriend, where [Thompson] himself had electric bills in his name and where his fingerprints were recovered from the living room. The shooter is seen with the same build and distinctive hairstyle that [Thompson] had at the time of the crime. [Thompson's] cell phone—with [only] his DNA on it—was found in the exact location on the street where the shooter pulled a gun out of his pocket and shot the victim. Contrary to [Thompson's] dubious story that he forgot his phone and had left it with the victim, who then conveniently used [the] phone to call [Thompson's] uncle just minutes before the murder, the victim's DNA was *not* present on [Thompson's]

phone. Finally, despite [Thompson's] confirmed awareness that he was a suspect for murder, he evaded arrest for over a year, demonstrating his consciousness of guilt. . . . The evidence, viewed as it must be in a light most favorable to the Commonwealth, was clearly sufficient to prove that [Thompson] committed this murder.

Commonwealth's Brief, at 15-16.

Our review of the record substantiates the Commonwealth's discussion of evidence bearing on the question of identity, and, when viewing the evidence in a light most favorable to the Commonwealth as verdict-winner and giving the Commonwealth the benefit of all reasonable inferences from it, we deem it sufficient to prove beyond a reasonable doubt that Thompson committed murder in the first-degree.

Captured on video was the close-range, execution style shooting of Thompson's longtime neighborhood friend, Mr. Robert Lee, by a young man who shared Thompson's height, build, and distinctive dreadlock hairstyle and had just walked out of the nearby address where Thompson's girlfriend resides and Thompson frequently visits. Crime scene investigators found Thompson's cell phone lying on the sidewalk at the exact location where the shooter pulled the gun from his pocket, fired, and ran. Officer Tiffany Drew of the Philadelphia Police Department's Crime Unit testified that her examination of the phone found no fingerprints, so she performed a swab for touch DNA and recovered only Thompson's DNA, N.T., 6/11/24, at 35, 39, evidence that further undermined Thompson's and his Uncle's dovetailed testimonies that Robert Lee had used Thompson's cellphone just a minute or two before the shooting to call Thompson's uncle and inform him that Thompson

- 10 -

inadvertently left his phone there after a friendly visit. Finally, evidence of Thompson's avoidance of police after learning he was wanted for questioning was admitted as consciousness of guilt. *See Commonwealth v. Lukowich*, 875 A.2d 1169, 1173-74 (Pa. Super. 2005) (upholding trial court's instruction on the defendant's flight and explaining that "where evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt" (citation omitted)). When viewed in light of our jurisprudence discussed *supra*, this evidence was sufficient to convict Mr. Thompson as the man who murdered Mr. Lee by gunfire.

We turn to Mr. Thompson's issue assigning error with the trial court's order denying his post-trial challenge to the weight of the evidence offered as to each of the charges on which he was convicted. Here, he argues that among those certain facts of greater weight admitted on the issue of whether he was the shooter were, specifically, his own testimony adamantly denying having any reason to shoot or kill Lee, and his uncle's testimony that Mr. Lee had made a telephone call to him right before the time of the shooting to ask that he come to Lee's residence to collect the cellphone that his nephew Thompson accidentally had left there earlier that morning during a visit.

Mr. Thompson's argument in support of his weight of the evidence claim states, in its entirety:

> [F]or the Commonwealth to prove a case of murder in the first
> degree, and for evidence to be sufficient, the Commonwealth has
> to prove beyond a reasonable doubt that . . . Mr. Thompson did

- 11 -

the killing. What is lacking in this case is strong, acceptable, credible, non-speculative and non-contradictory evidence that Mr. Thompson did the killing.

No one identified Mr. Thompson as the shooter. His cellphone was there, but Mr. Thompson explained it, and as noted above, this was confirmed by his uncle, who received a call from Mr. Lee[,] about a minute or two before Mr. Lee's death, indicating he had to come and get the cellphone. Three, there was no reason for Mr. Thompson to kill Mr. Lee since they were good friends, and had been for many years. Four, the text messages that came in through the Commonwealth's rebuttal were never properly authenticated, and the statements of [Sue] Arnold should not have been treated as substantive evidence since she was not present, and there was no effort to even bring her in. Her statements were testimonial in nature, and there was a denial of right to confront under the United States Constitution.

Brief of Appellant, at 50-51.

Preliminarily, we note that a verdict is against the weight of the evidence "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. VanDivner*, 962 A.2d 1170, 1177 (Pa. 2009) (citation omitted). "[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Miller*, 172 A.3d 632, 643 (Pa. Super. 2017) (citation omitted). It is well-established that a weight of the evidence claim is addressed to the discretion of the trial court, and "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000).

Further, when evaluating the trial court's ruling, we must remember that an abuse of discretion is not merely an error in judgment. *Commonwealth*

*v. Arnold*, 284 A.3d 1262, 1277 (Pa. Super. 2022). Instead, an abuse of discretion is shown when a court's decision is based upon bias, partiality, prejudice, ill-will, manifest unreasonableness, or a misapplication of the law. *Id*. By contrast, a proper exercise of discretion conforms to the law and is based on the facts of record. *Id*.

> Importantly, the trial court's role in addressing a weight claim is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater significance that to ignore them, or to give them equal importance with all other facts from the case, is to deny justice. *Widmer*, 744 A.2d at 752. On appeal, the Superior Court's role when considering a weight claim is to evaluate the trial court's analysis of the issue. *Id*. Even so, because a motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to support the verdict, neither is the court under an obligation to review the evidence in the light most favorable to the verdict winner. *Id*. Finally, appellate review "is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008).

*Commonwealth v. Rodriguez-Quijano,* (non-precedential decision) --- A.3d ----, 2026 WL 1805754. (Pa. Super. filed June 23, 2026).

In response to Thompson's weight of the evidence argument, the Commonwealth posits that the jury clearly rejected the self-serving timeline of events offered by Thompson and his uncle in attempting to explain away both the presence of Thompson's cellphone at the murder scene and its call history indicating a call to the uncle made from it just one or two minutes before the shooting. Thompson and his uncle attributed the phone call to Lee and described the call as nothing more than a friendly reminder for someone

to retrieve the phone that Thompson forgot when the two had ended their friendly visit.

More than countering the weight of this testimonial evidence offered by the Defense, however, was the Commonwealth's contrary evidence that neither Lee's fingerprints nor his DNA was on the cellphone despite Thompson's testimony that he accidentally left it at Lee's place earlier that day and the uncle's testimony that Lee used it to place a call to him. The call history maintained in the cellphone's records confirmed that Thompson's phone was used to call his uncle just one or two minutes before the shooting, but the absence of Lee's fingerprints and DNA on a cellphone that the Defense claimed he used just a short time before investigators collected it from the crime scene and tested it casts significant doubt on Thompson's and his uncle's veracity as witnesses.

Thompson fails to show that the trial court erred in rejecting his post-sentence motion arguing that defense evidence assumed the greater weight at trial and therefore entitled him to a new trial. Again, when viewed in conjunction with the other evidence of Thompson's guilt as discussed *supra*— including discovery of his cellphone at the very spot where video depicts the shooter pulling a gun from his pocket—there is no apparent error with the trial court's appraisal of the record and determination that the trial court exercised appropriate discretion when it found that the jury properly assessed all evidence and witness credibility as finder of fact. Accordingly, we discern no

basis upon which to disturb the trial court's order denying Thompson's post-sentence motion for a new trial based on the weight of the evidence.

In Thompson's final three issues, which we take together, he contends that the trial court erred and/or abused its discretion when it overruled his objection to the Commonwealth's use of text messages between Sue Arnold and him as rebuttal to his testimony during direct examination and cross-examination that he had no reason to shoot Lee because they enjoyed a friendship.[6] Specifically, he contends that the admission of the text message conversations without Sue Arnold's presence in court deprived him of his constitutional rights under both Article I, Section 9 of the Pennsylvania Constitution and the Sixth Amendment of the United States Constitution to confront witnesses, violated Pennsylvania's Rule against Hearsay, and otherwise was inadmissible without her in-court authentication.

The trial record shows that the Commonwealth sought to rebut Thompson's testimony that there was no reason for him to want to hurt or shoot his good friend Lee. To do so, it re-called Detective Thorsten Lucke to the witness stand to expand upon his testimony from several days earlier regarding the police department's forensic investigation of Thompson's cellphone. Detective Lucke explained that they used a digital software process to extract and analyze data stored in the cellphone. N.T., 6/13/24, at 96-97.

_____

[6] At trial, Mr. Thompson denied having any motive or reason to shoot or kill Mr. Lee, testifying, "I would have no reason to want to bring harm his way. I know him my whole life. I know his family. None whatsoever." N.T., 6/13/26, at 34.

The result was the acquisition of texts transmitted on September 11th, 12th, and the 17th of 2020, between Thompson and his then-girlfriend Sue Arnold. N.T. at 98-100. The detective used screenshots of the text conversations, which were introduced into evidence as Commonwealth exhibits, to illustrate his testimony. N.T. at 97-98. At this point, the Defense lodged multiple objections alleging inadmissible hearsay and violations of the confrontation clause and Pa.R.E. 403(b), all of which the trial court overruled. N.T. at 97-98.

The Defense made a separate objection that Sue Arnold was uncooperative and unavailable when it sought her for examination, and it made confrontation, hearsay, and unfair prejudice objections and moved for mistrial each time her text message conversation with Thompson was introduced or discussed. N.T. at 101. The trial court noted the objections and overruled them. *Id*.

The text messages in question between Sue Arnold and Thompson were read into evidence during rebuttal testimony offered by Detective Lucke:

> **Detective Lucke**: So [a September 11, 2020, text transmitted from Arnold to Thompson] reads: "IDGAF about no strap. I will shoot you myself. You not tough. You need PPL around to feel tough or a gun to feel tough earlier. You was extra scared talking about you don't want no problems. And now you don't cause you have a gun. You are a joke. I have access to plenty of guns and TBH, I can get you shot if I want to. I know all your whereabouts."
>
> **Defense Counsel**: I have to move for a mistrial now on that –
>
> **Trial Court**: That's denied.

. . .

**Detective Lucke**: The next message after this – so [the first text message] was at 9:46:59 a.m. This followed up 14 seconds later at 9:47:13 with another incoming message. So, Sue continues sending messages to [Thompson's] device. The content of the next message is: "Yeah. You on the corner. Once I leave, I'mma call someone."

. . .

**Detective Lucke**: The next message, is about 30 seconds later approximately, at 9:47:45 a.m., is an outgoing message from the device attributed to Thompson to Sue. And it reads: "Okay. Cool."

. . .

**Detective Lucke**: 1:46 pm, on September 12th. At 1:46:07 p.m. is an outgoing message from the device attributed to Mr. Thompson to Sue, which reads; "I couldn't stop loving you if my life depended on it."

. . .

About 20 minutes later at 2:04:09 p.m., a follow-up message also from Mr. Thompson's device to Sue, just one word. It says: "Baby."

. . .

[The next text] is a reply from Sue at 3:26:44 p.m., that same date. And it read: "Love you babe."

. . .

And followed up to the same second almost, a quick message afterwards from Sue: "I'm so happy I cooked today."

. . .

- 17 -

[The next text is] Also from Sue at 3:42:29 p.m. And it reads – from Sue to Mr. Thompson's device – "I must start using my air fryer, babe."

. . .

[The next text] is a reply from Mr. Thompson's device to Sue. It's just a few minutes later, about eight minutes later, at 3:50:58 p.m., a message from Mr. Thompson's Device to Sue, which states: "Love you, too, crazy."

. . .

[Five days after that, on September 17th, starting at 10:35:38 a.m. is a string of three incoming messages to Mr. Thompson's device from Sue, which read:

> "Okay, babe, WYD handsome?" The next one after that, just about a minute later at 10:36:41 a.m., again, . . . is: "Babe, can you Cash App me $40 and you can take it out my stash today if you want? And the third message in that string from Sue is: "I need to sign up for the IdentityIQ."

The next series of text messages between Thompson and Arnold pertain to Thompson's discovery that Lee has posted something online suggesting that he has a pornographic video of Arnold:

**Detective Lucke**: [The next text is a] return message from Mr. Thompson's device to Sue at 10:50:56 a.m. which reads: "Call me."

. . .

[T]wo hours and 50 minutes later, approximately . . . is a message from Sue to Mr. Thompson's device, and that reads: "Send the video to my phone, please."

[One minute later] is the reply to that message . . . from Mr. Thompson's device to Sue: "He doesn't have it. He talking about he was on Pornhub and it looked like you."

Sue then answers – again, this is a fairly quick exchange, seconds later. She writes back to Mr. Thompson's device: "He sitting here

- 18 -

probably starting rumors about me because if he showed you, I'm sure he showed other people on the block.  And I'm about to get him beat up by one of my cousins TBH.  Send me the video, please."

She follows up with another message about a minute after that at 1:09:29 p.m.:  "His whole story sound crazy ASF.  He found a porno of me online, this N-[*-*-*-*] wishing that bitch was me cause he can't get me."

And she continues at 1:09:53 p.m.:  "Send me the video.  I'm about to pull trash through."

Then the next message from that exchange is about an hour and 40 minutes later.

It's now a message from Mr. Thompson's device to Sue.  And it reads:  "You don't want me to come back?"

And then about ten minutes later he writes, meaning Mr. Thompson's device writes:  "Can you answer me?"

And then there's nothing for about an hour and 15, 16 minutes.  So, at 3:16;25 p.m., Mr. Thompson's device writes:  "Okay. Cool.  Ignore me all you want."

And the next exchange – part of this exchange was immediately almost after this last message we just read, is a reply from Sue, which reads:  "Ima ask Waters [a nickname for Lee] and see what's going on."

. . .

[**DEFENSE COUNSEL**]:  I'm going to object to all of this and move for a mistrial.

[**TRIAL COURT**]: All right.  Overruled, and denied.

. . .

[**PROSECUTOR**]:  Could you please click one up so that we capture the next text?  What was the response to the last text you read?

**DETECTIVE LUCKE**: So the next message was from Sue to this device. The response was from Sue to this device. [Mr. Thompson's] response to that, about 13 minutes later at 3:29:42 p.m., is: "Okay. Should I move my stuff back out?

. . .

[**PROSECUTOR**]: All right. Next, after the text, "Okay, should I move my stuff back out"; what is the next text?

**DETECTIVE LUCKE**: . . . The next message in this ongoing conversation is about an hour-and-a-half later, at 5:06 p.m., and it's a message from Sue to Mr. Thompson's device, which reads: "From this day on, you better not get smart with me" –

[**PROSECUTOR**]: Your Honor, may I see you at sidebar?

[**TRIAL COURT**]: Yes.

[**DEFENSE COUNSEL**]: Just note, again, my motion for a mistrial collectively and individually.

[**TRIAL COURT**]: Understood. Denied collectively and individually. I'll see the parties.

. . .

**DETECTIVE LUCKE** [(Resuming)]: Continuing with the message on September 17th, 2020, at 5:06 p.m. again, coming from Sue to Mr. Thompson's device: "You better not disrespect me with words either. I'm sitting her checking a N-[*-*-*-*] that you scared to put in his place."

[**PROSECUTOR**]: And the response to that?

[**DEFENSE COUNSEL**]: Just note my objection and mistrial motion.

[**TRIAL COURT**]: It's noted. Overruled and denied.

**DETECTIVE LUCKE**: The response is at 5:16:51 p.m., so about 15 minutes after that last message came to Mr. Thompson's device. And it reads: "I aint scared of shit or nobody. Don't disrespect me. I won't disrespect you."

Moving on. So, about a minute-and-a-half later at 5:18:32 p.m., Sue now responds to the device attributed to Mr. Thompson and the content of that message is: "N-[*-*-*-*], save that talk and energy for him. You keep giving hype with me but extra calm with this N-[*-*-*-*]. Get TF out my face. Don't say nothing else to me unless you're going to be nice like you was to him."

[**DEFENSE COUNSEL**]:      Again, just note – I have to move for a mistrial on that.

[**TRIAL COURT**]:      Understood. Denied.

[**DEFENSE COUNSEL**]:      Can I ask for a curative instruction or, I guess, not curative, but a limiting instruction at this point?

[**TRIAL COURT**]:      This is not the time. I have drafted an instruction. Well, maybe this is the time.

All right. Ladies and gentlemen, the evidence that that's being presented regarding the text messages allegedly between the defendant and an individual named Sue are being presented to rebut the defendant's testimony regarding the nature of their relationship at the time of the murder, the defendant's location at the time of the murder, the conflicts that they allegedly had regarding her seeing another person or his jealously [sic] around that time, to rebut his assertion that he never had a gun, and here the assertion is that he had a gun, and his denial that someone would be speaking to him about the relationship that she was having with someone else or something like that.

So, the credibility and weight of this rebuttal evidence is for you to determine. **This evidence may be considered by you only for the purpose of judging the defendant's credibility and the credibility and the weight of the testimony given by the defendant at this trial.**

**In other words, it is offered to rebut his testimony. You may not convict the defendant solely based on evidence of these communications**. You should consider all of the evidence presented in deciding whether the defendant has been proven guilty beyond a reasonable doubt.

Everyone understand that? All right. Very good.

- 21 -

[**DEFENSE COUNSEL**]:       Your Honor, I just have an objection to the last sentence. . . .

[**TRIAL COURT**]:       All right.  Overruled.

[**PROSECUTOR**]:       Detective Lucke, how many text messages between Sue and the defendant [Mr. Thompson] are there in total on this phone and these are in the instant messages?

**DETECTIVE LUCKE**:   They're in the instant message folder. They are what we call traditional messages, so SMS, short message service, message from device to device, direct communications.

There were – during this time period of the date on the phone, there was a total of just under 1200, 1179 messages total that were recovered from this device.

518 of these 1200 were just under about half, almost half, were between this device – were from this device with Sue.  518 out of all the messages on this device [Mr. Thompson's device] . . . were with Sue.

[**DEFENSE COUNSEL**]: Can I just ask what time period?

. . .

**DETECTIVE LUCKE**:   . . .  So the first messages that we see here started on August 20th of 2020 out of these 518.  And the last one is on September 19th, 2020.  So, again, almost exactly a month.

[**PROSECUTOR**]:  And the time of the September 19th, 2020, text message?

**DETECTIVE LUCKE**:   The last message here is on September 19th, 2020, at 4:45 a.m.

[**PROSECUTOR**]: And who is that from?

**DETECTIVE LUCKE**:   From Sue to Mr. Thompson's device.

N.T., 6/13/24, at 96-115 (emphasis added).

- 22 -

The Commonwealth contends that the purpose of its evidence comprising the entire text message communications between Thompson and Sue Arnold was to impeach the credibility of Thompson's trial testimony that he had no reason to shoot his good friend Robert Lee. The Commonwealth argued at trial that Thompson shot Lee to prove his love to Sue Arnold. The text messages show that Arnold had challenged Thompson's manhood and implied that his worth to her was conditional on his protecting her reputation by exacting revenge on Lee for humiliating her publicly.

The trial court's jury charge hewed to its earlier statement that the jury was to limit its use of the text messages to impeaching the veracity of Thompson's testimony that he did not shoot Lee and had no reason to shoot his good friend:

> **Trial Court**: Evidence was presented on rebuttal regarding text messages between the defendant and "Sue" or "Susanne Arnold." The credibility and weight of this rebuttal evidence is for you to determine. **This evidence may be considered by you for one purpose only; that is, to help you judge the credibility and weight of the testimony given by the defendant as a witness in this trial. In other words, you may not convict the defendant solely on the evidence of these communications.** Specifically, the evidence was presented to rebut the defendant's whereabouts around the time of the crime, the nature of his relationship to Sue around the time of the murder, his testimony about her seeing other people, and conflicts they had over jealousy around the same time, his testimony that he has never owned a gun, and his denial that the decedent, also known as "Waters," was asked or would have been asked to talk to the defendant about Sue. **Again, this evidence is for rebuttal, and you may not find the defendant guilty based on this evidence alone.** You should consider all of the evidence presented in deciding whether the defendant has been proven guilty beyond a reasonable doubt."

N.T., 6/14/26, at 16-18 (emphasis added).

Rulings on admissibility are committed to the trial court's discretion and will only be reversed on appeal where there is an abuse of discretion. ***Commonwealth v. Orr***, 255 A.3d 589, 594 (Pa. Super. 2021) (citing ***Commonwealth v. Rogers***, 250 A.3d 1209, 1215 (Pa. 2021)). An abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised was either manifestly unreasonable or the product of partiality, prejudice, bias, or ill will. ***Orr***, 255 A.3d at 594-95.

We first address Thompson's three-prong challenge by considering his claim that reversible error lies with the failure of the Commonwealth to secure Sue Arnold's in-court authentication of the text message conversation with him. In general, "[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). Examples of evidence that satisfies the requirement of authentication pertaining to subsection (11), "Digital Evidence," *i.e.*, connecting digital evidence with a person or entity, include "direct evidence such as testimony of a person with personal knowledge[,]" and "circumstantial evidence such as . . . (i) identifying content; or (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship." "Digital Evidence." Pa.R.E. 901(b)(11) (i) and (ii).

Here, Thompson argues that his case most resembles the facts reviewed in this Court's decision in *Commonwealth v. Koch*, 39 A.3d 996 (Pa. Super. 2011), where we held that a detective's description of his own transcription of text messages was insufficient for purposes of authentication where the defendant Koch had not authored all the text messages on her phone. *See Koch*, 29 A.3d at 1005. At the outset of our discussion in *Koch*, we rejected the notion that doubts as to the identity of the sender or recipient of a text message go to the weight of the evidence. *Id.* at 1005. Instead, we instructed that "[a]uthentication is a prerequisite to admissibility." *Id*. Recognizing that certain cases may present difficulties with ascertaining authorship of text messages, because multiple persons may have access to an electronic device without permission, we held that "authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required." *Id*. at 1005.

Turning to the facts in *Koch*, we observed that "glaringly absent [was] any evidence tending to substantiate that [Koch] wrote the drug-related text messages. No testimony was presented from persons who sent or received the text messages. There are no contextual clues in the drug-related text messages themselves to reveal the identity of the sender." *Id*. at 1005.

Distinguishing the present matter from the facts of *Koch*, however, is that Mr. Thompson confirmed during his testimony that the cellphone and the

cellphone number appearing in the relevant communications with Sue Arnold's cellphone were his and hers. He also testified that he called her same phone number four times on the morning of the September 20, 2020, murder of Robert Lee, with three calls at 8:02 a.m, 8:03 a.m., 9:30 a.m. going unanswered and a fourth call that he abandoned after one second. N.T. at 34-35, 38-39. 40-42. When asked why he called, he answered, "I assumed that I would be in the area that day." N.T. at 42.

Additionally supporting the testimony that Thompson and Sue Arnold are the persons who participated in the communications in question, the Commonwealth submits, are the contextual clues that were lacking in **Koch**, as the present record of text communications contains the "exchanging of love language" between Thompson and Sue Arnold over a course of weeks.

We liken the present facts to those in **Commonwealth v. Orr**, 255 A.3d 589 (Pa. Super. 2021), where we held circumstantial evidence demonstrating it was the defendant who had sent threatening text messages to the victim both on the night of and during the month leading up to the murder was sufficient to authenticate the text messages. Similarly authenticating the texts here was the content ranging from intimate matters between them to mutual anger upon learning Mr. Lee had published a pornographic video that he claimed depicted Ms. Arnold, and her caustic insistence that Thompson would do something about it if he were a man. Therefore, given both Thompson's admission that the cellphones and phone numbers appearing on text messages and phone call records, including his unanswered calls to her

on the morning of the murder, belonged to him and Sue Arnold, and the corroborative contextual evidence in the text messages between them were sufficient to authenticate the communications.

Thompson also contends that admission of the text messages between himself and Sue Arnold violated his right to confront her under the Confrontation Clause of The United States and Pennsylvania Constitutions, which protect the right of each criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI; PA. CONST. Art. I § 9.

> A defendant's claim that he was denied his right to confront a witness under the Confrontation Clause of the United States and Pennsylvania Constitutions is a pure question of law for which our standard of review is *de novo.* ***See Commonwealth v. Grush***, 295 A.3d 247, 250 (Pa. Super. 2023), *appeal denied*, 308 A.3d 770 (Pa. 2023). "The focus of the Confrontation Clause is testimonial hearsay." ***Commonwealth v. Agnew***, 299 A.3d 1001, 1007 (Pa. Super. 2023) (citation omitted). Accordingly, the Confrontation Clause is not implicated by the admission of non-testimonial or non-hearsay statements. ***See id.***
>
> . . .
>
> Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). Accordingly, an "out of court statement offered not for its truth but to explain the witness's course of conduct is not hearsay." ***Commonwealth v. Rega***, 593 Pa. 659, 933 A.2d 997, 1017 (2007) (citing ***Commonwealth v. Sneed***, 526 A.2d 749, 754 (Pa. 1987)).

***Commonwealth v. Nabried***, 327 A.3d 315, 326 (Pa. Super. 2024).

The trial record shows that the Commonwealth sought on rebuttal to impeach Thompson's testimony that there was no reason for him to want to hurt or shoot his good friend Lee. To do so, it re-called Detective Thorsten

Lucke to the witness stand to expand upon his testimony from several days earlier regarding the police department's forensic investigation of Thompson's cellphone. Detective Lucke explained that they used a digital software process to extract and analyze data stored in the cellphone. N.T., 6/13/24, at 96-97.

The result was the acquisition of texts transmitted on September 11th, 12th, and the 17th of 2020, between Thompson and his then-girlfriend Sue Arnold. N.T. at 98-100. The detective used screenshots of the text conversations, which were introduced into evidence as Commonwealth exhibits, to illustrate his testimony. N.T. at 97-98. At this point, the Defense lodged multiple objections alleging inadmissible hearsay and violations of the confrontation clause and Pa.R.E. 403(b), all of which the trial court overruled. N.T. at 97-98.

The Defense made a separate objection that Sue Arnold was uncooperative and unavailable to the defense when it sought her for examination, and it made Confrontation Clause, Hearsay, and Rule 403(b) unfair prejudice objections and moved for mistrial each time her text message conversation with Thompson was introduced or discussed. N.T. at 101. The trial court noted the objections and denied the motions for mistrial. *Id*.

The Commonwealth contends that the purpose of its evidence comprising the entire text message communications between Thompson and Sue Arnold was to show the jury that, contrary to Thompson's testimony that he would have had no reason to shoot his good friend Lee, one plausible reason was to prove his love to Sue Arnold. We agree that Sue Arnold's text

communications with him were offered not for the truth of the matter she asserted therein but for the purpose of providing context of the relationship between Thompson and her and to show that Thompson did, in fact, despite his testimony otherwise, have a reason to retaliate against Mr. Lee. Therefore, because we conclude that Sue Arnold's text message communications with Mr. Thompson did not constitute hearsay, Mr. Thompson has not produced the testimonial hearsay necessary to support his Confrontation Clause claim.

Finally, our previous determination that the text communications in question are not hearsay likewise leads us to deem meritless Thompson's final claim that the text messages constitute inadmissible hearsay.

Judgment of sentence is affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/20/2026